Borough of Pottstown              :
                                    :
         v.                 :
                                      :

Shanicqua Suber-Aponte,       :    No. 478 C.D. 2017
                  Appellant    :    Submitted: July 13, 2018

BEFORE:    HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION BY
JUDGE COVEY                         FILED: January 8, 2019

Shanicqua Suber-Aponte (Requester), pro se, petitions this Court for review of the Montgomery County Common Pleas Court's (trial court) November 21, 2016 order denying Requester's Right-to-Know Law (RTKL)[1] request (Request). Requester presents three issues for this Court's review: (1) whether the trial court erred by finding that the Request lacked specificity; (2) whether the trial court erred by finding that the content requested was exempt under the RTKL and the Criminal History Record Information Act (CHRIA);[2] and (3) whether the trial judge erred by failing to recuse himself. After review, we affirm in part, reverse in part and vacate and remand in part.

**Background**

On November 25, 2015, Requester submitted the Request to the Borough of Pottstown (Borough) seeking a copy of "police video footage [(footage)] on October 4, 2015 of herself . . . from the time [she was] brought in [to the police

---

[1] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.
[2] 18 Pa.C.S. §§ 9101-9183.

department (Department)] and all activity at [the Department] that day."[3]  Original Record (O.R.) Item 0 (Petition for Review (Petition)) Ex. A at 16.  On January 4, 2016,[4] the Borough denied the Request, stating that the footage was exempt from disclosure under Section 708(b)(1)(ii) (personal security), 708(b)(2) (public safety), 708(b)(3) (safety or physical security of a building), 708(b)(16) (criminal investigation) and 708(b)(17) (noncriminal investigation) of the RTKL,[5] and Sections 9102 (investigative information defined) and 9106 (investigative information) of CHRIA.[6]  *See* O.R. Petition Ex. B at 19.  The Borough also maintained that the Request "lacked specificity [required by Section 703 of the RTKL,] 65 P.S. § 67.703[.]"  O.R. Petition Ex. B at 20.

On January 13, 2016, Requester appealed to the Pennsylvania Office of Open Records (OOR), challenging the Borough's denial.  *See* O.R. Petition Ex. C.  The OOR allowed both parties to supplement the record.  By January 25, 2016 letter, the Borough submitted a response with references to the RTKL and an affidavit by Borough Police Chief F. Richard Drumheller (Drumheller) (Affidavit).  *See* O.R. Petition Ex. D.  Requester did not supplement the record.  The matter was stayed pending resolution of *Rothey v. California Borough*, OOR Docket No. AP 2015-1925 (issued June 15, 2016) (relating to whether police department footage of a

---

[3] A "record" is defined by Section 102 of the RTKL as:

> Information, regardless of physical form or characteristics, that documents a transaction or activity of an agency and that is created, received or retained pursuant to law or in connection with a transaction, business or activity of the agency. **The term includes a** document, paper, letter, map, book, tape, photograph, **film** or sound **recording**, information stored or maintained electronically and a data-processed or image-processed document.

65 P.S. § 67.102 (emphasis added).  Accordingly, footage is a record.

[4] The Borough invoked a 30-day response extension under Section 902(b)(2) of the RTKL, 65 P.S. § 67.902(b)(2).

[5] 65 P.S. § 67.708(b)(1)(ii), (b)(2), (b)(3), (b)(16), (b)(17).

[6] 18 Pa.C.S. §§ 9102, 9106.

confrontation between police and a detainee in a holding cell was a public record),[7] which involved a similar request.

On July 15, 2016, the OOR issued its final determination (Final Determination) granting Requester's appeal and ordering the Borough to produce the footage because the Borough "did not meet its burden" to show that the footage was investigative, or that "disclosure of the [footage] would threaten personal security, public safety, or the security of the [Department]." O.R. Petition Ex. F (Final Determination) at 58. The OOR also found the Request to be sufficiently specific. *Id.* at 61-62.

On August 15, 2016, the Borough appealed to the trial court. The trial court held a hearing on September 16, 2016, which neither Requester nor the Borough attended. *See* O.R. Item 5 (Borough Proposed Findings of Fact and Conclusions of Law (Statement)) at 106-126. On November 21, 2016, the trial court issued its Findings of Fact (FOF) and Order, holding therein that the Request was insufficiently specific, and that the Borough "established by a preponderance of the evidence that the [footage] is exempt from disclosure" under the RTKL's personal security, public safety, building safety/security and/or criminal and noncriminal investigation exceptions. O.R. Item 6 (Trial Ct. Order) at 1; *see also* O.R. Item 6 (Trial Ct. FOF) at 2-11. Requester filed a Notice of Appeal (Appeal) with the Pennsylvania Superior Court on December 15, 2016. The trial court issued its

---

[7] In *Rothey*, the OOR declared that the video recording was not exempt from disclosure because the borough's evidence was merely speculative. The Washington County Common Pleas Court agreed with the OOR. On appeal, this Court reversed the Washington County Common Pleas Court's order, concluding that although the video recording was not exempt from disclosure under the RTKL's security-related exemptions (*e.g.*, Section 708(b)(1)-(3) of the RTKL), it was exempt under the RTKL's criminal and noncriminal investigation exceptions (*e.g.*, Section 708(b)(16) and 708(b)(17) of the RTKL) and CHRIA. *See California Borough v. Rothey*, 185 A.3d 456 (Pa. Cmwlth. 2018).

opinion on January 26, 2017. *See* Borough Br. Ex. B, Trial Ct. Op. By March 3, 2017 Order, the Superior Court transferred the Appeal to this Court.[8]

**Discussion**

**1. Specificity**

Requester first argues that the trial court erred by finding the Request insufficiently specific under the RTKL. Section 703 of the RTKL requires that "[a] written request should identify or describe the records sought with sufficient specificity to enable the agency to ascertain which records are being requested . . . ." 65 P.S. § 67.703.

"When considering a challenge to the specificity of a request under Section 703 of the RTKL, this Court employs a three-part balancing test[.]" *Pa. Dep't of Educ. v. Pittsburgh Post-Gazette*, 119 A.3d 1121, 1124 (Pa. Cmwlth. 2015). The test examines "the extent to which the request sets forth[:] (1) the subject matter of the request; (2) the scope of the documents sought; and (3) the timeframe for which records are sought." *Id.* "The subject matter of the request must identify 'the transaction or activity' of the agency for which the record is sought[]" and "should provide a context to narrow the search." *Id.* at 1125 (quoting Section 102 of the RTKL, 65 P.S. § 67.102). In terms of scope, the request "must identify 'a discrete group of documents, either by type . . . or by recipient.'" *Id.* (quoting *Carey v. Dep't*

---

[8] This Court's "review of a trial court's order in a[n] RTKL dispute is 'limited to determining whether findings of fact are supported by competent evidence or whether the trial court committed an error of law, or an abuse of discretion in reaching its decision.'" *Butler Area Sch. Dist. v. Pennsylvanians for Union Reform*, 172 A.3d 1173, 1178 n.7 (Pa. Cmwlth. 2017) (quoting *Kaplin v. Lower Merion Twp.*, 19 A.3d 1209, 1213 n.6 (Pa. Cmwlth. 2011)). "The scope of review for a question of law under the [RTKL] is plenary." *SWB Yankees LLC v. Wintermantel*, 999 A.2d 672, 674 n.2 (Pa. Cmwlth. 2010) (quoting *Stein v. Plymouth Twp.*, 994 A.2d 1179, 1181 n.4 (Pa. Cmwlth. 2010), *aff'd*, 45 A.3d 1029 (Pa. 2012)).

*of Corr.*, 61 A.3d 367, 372 (Pa. Cmwlth. 2013)[9]).  Lastly, "[t]he timeframe of the request should identify a finite period of time for which records are sought." *Pittsburgh Post-Gazette*, 119 A.3d at 1126; *see also Office of the Dist. Attorney of Phila. v. Bagwell*, 155 A.3d 1119, 1145 (Pa. Cmwlth. 2017) (A request is sufficiently specific where it enumerates a "clearly[-]defined universe of documents."); *Askew v. Pa. Office of the Governor*, 65 A.3d 989, 992 (Pa. Cmwlth. 2013) (A request lacks specificity where "it is open-ended in terms of a timeframe[ and] overly broad in the scope of documents sought[.]").

Here, in the trial court's two-sentence discussion at the end of its opinion, it ruled the Request insufficiently specific "because it seeks [footage] from the [Department] for the entirety of October 4, 2015 without identifying a relevant timeframe, department/area, involved police officer or staff."  Trial Ct. FOF at 10. However, after review, this Court holds that the Request clearly identifies the subject matter of the request (Department activity and Requester), the scope of records sought (video surveillance footage) and a specific timeframe (October 4, 2015 - a single day).  *See Easton Area Sch. Dist. v. Baxter*, 35 A.3d 1259 (Pa. Cmwlth. 2012) (30 days is a sufficiently-specific timeframe to request records).  Moreover, the Borough's denial clearly reflects the Borough's knowledge of which footage would be responsive to the Request.  *See* O.R. Petition Ex. D (Affidavit) ¶ 11.[10]  Thus, "the [R]equest was obviously sufficiently specific because the [Borough] has already identified potential records included within the [R]equest."  *Easton Area Sch. Dist.*,

---

[9] *Carey* was supplemented by *Carey v. Pennsylvania Department of Corrections* (Pa. Cmwlth. No. 1348 C.D. 2012, filed July 3, 2013), because the Court reserved judgment as to the denial of access under the personal security exception and the public safety exception pending receipt of supplemental evidence limited to those exceptions.

[10] Paragraph 11 of the Affidavit states: "The release of the [footage], which is the subject of this [RTKL] Request, would reveal the layout of the [D]epartment, processing area, holding cell, and, also, the capabilities, range and scope of the camera."  Aff. ¶ 11.

35 A.3d at 1265. Accordingly, the Request is sufficiently specific under Section 703 of the RTKL and it was error for the trial court to hold otherwise.

## 2. Exemptions

Requester next argues that the trial court erred in finding that the information requested was exempt under the RTKL and CHRIA. Initially, this Court acknowledges that "the [RTKL] is remedial legislation designed to promote access to official government information in order to prohibit secrets, scrutinize the actions of public officials, and make public officials accountable for their actions[.]" *Bowling v. Office of Open Records*, 990 A.2d 813, 824 (Pa. Cmwlth. 2010) (en banc), *aff'd*, 75 A.3d 453 (Pa. 2013). "[T]he enactment of the RTKL . . . was a dramatic expansion of the public's access to government documents." *Levy v. Senate of Pa.*, 65 A.3d 361, 381 (Pa. 2013). The Borough is a local agency required to disclose public records under the RTKL. Section 302 of the RTKL, 65 P.S. § 67.302.

"Under the RTKL, records in possession of an agency are presumed public unless they are: (1) exempt under Section 708 of the RTKL; (2) protected by privilege; or, (3) exempt 'under any other [f]ederal or [s]tate law or regulation or judicial order or decree.'" *Pa. State Police v. Kim*, 150 A.3d 155, 157 (Pa. Cmwlth. 2016) (quoting Section 305 of the RTKL, 65 P.S. § 67.305). If "the requested information is exempt under Section 708(b) [of the RTKL], the information is not a 'public record' and is exempt from disclosure in its entirety." *Dep't of Labor & Indus. v. Simpson*, 151 A.3d 678, 684 (Pa. Cmwlth. 2016). Accordingly, exemptions must be narrowly construed, and the agency claiming the exemption bears the burden of proof by a preponderance of the evidence.[11] *See* 65 P.S. § 67.708(a); *see also*

---

[11] "A preponderance of the evidence standard, the lowest evidentiary standard, is tantamount to a more likely than not inquiry." *Del. Cty. v. Schaefer*, 45 A.3d 1149, 1156 (Pa. Cmwlth. 2012).

*Bagwell; Pa. Office of Inspector Gen. v. Brown*, 152 A.3d 369 (Pa. Cmwlth. 2016); *Simpson*.

Here, the Borough denied the Request based on a number of enumerated RTKL exemptions and two CHRIA exemptions. This Court will address them in order.

### a. Personal Security

Section 708(b)(1)(ii) of the RTKL states that records are exempt which, if disclosed, "would be reasonably likely to result in a substantial and demonstrable risk of physical harm to[,] or the personal security of[,] an individual." 65 P.S. § 67.708(b)(1)(ii). "[U]nder this exception, the agency must demonstrate (1) a 'reasonable likelihood' of (2) a 'substantial and demonstrable risk' to a person's personal security." *Del. Cty. v. Schaefer*, 45 A.3d 1149, 1156 (Pa. Cmwlth. 2012). In order to show a reasonable likelihood, "[a]n agency must offer more than speculation or conjecture to establish the security-related exceptions under the [RTKL]." *California Borough v. Rothey*, 185 A.3d 456, 468 (Pa. Cmwlth. 2018). This Court has "defined substantial and demonstrable [risk] as actual or **real and apparent**." *Carey*, 61 A.3d at 373 (emphasis added).

Before the trial court, which heard this matter *de novo*, Drumheller testified that he has served as the Borough's police chief for approximately 3½ years, and served on the police force for 28 years. He explained that the police station consists of areas that, for security reasons, are neither open nor accessible to the general public. He explained that the doors to the secure areas are always locked and can only be opened by officers and detectives with specifically-programmed key access cards.[12]

---

[12] Depending upon the officers' clearance levels, they may have more or less access to certain secure areas with their key cards.

7

Drumheller further reported that the entire Department is under video surveillance recorded by approximately 13 cameras located "virtually everywhere but the bathroom." O.R. Item 5, Statement, Notes of Testimony, September 16, 2016 (N.T.) at 20. Drumheller explained that the cameras cover the Department's entrances, including the sally port entrance where detainees are taken from patrol cars to the cellblocks, the public area, the hallways and the cellblocks. He related that the cameras' live feeds are monitored 24 hours a day, 7 days a week by both dispatch and the detective division.

Drumheller added that the Department does not advertise the cameras' specific positions. Drumheller specified that to do so could compromise:

A. Security, safety, and, quite frankly, you would[] reveal information that would be damaging -- cameras have blind spots to them in locations. We wouldn't want anybody to know that they could stand here and not be on camera or that type of event. So we don't advertise that.

Q. Do you believe there would be a risk to the officers if the general public were aware of the location of the cameras and the camera angles within the [Department]?

A. Absolutely.

Q. And do you believe there would be safety issues for detainees within the [Department] if the general public were to know the position and blind spots of those cameras?

A. Yes. And I reference that to [sic] recently we had a prisoner attempt to hang [him/herself], and we managed to catch that on camera and get [him/her] help before [he/she] complete [sic] that.

N.T. at 18-19.

Further, Drumheller described the safety concerns inherent in allowing the public access to view the Department's transport procedures:

A. Well, for me personally, that's the most paralyzing thought of all this, because we have a strict policy on no

guns in the cellblock, because we believe that with the cameras, that you stand a better chance of not having a weapon in the cellblock, the same reason they don't like weapons in court. One of the things that they would be able to do is they would be able to watch our movement inside the sally port. They would be able to see where we locked our weapons. They would be able to see how we lock our weapons. They would be able to see . . . where we keep the electronic opening device for the door. They would virtually have access to everything by being able to review the video and see our procedures as we locked up somebody.

Q. And by the general public having access to everything, as you just noted, including the procedures, do you believe that that would create a substantial risk of harm to the officers, the detainees, and anyone else within that building?

A. I believe that's an understatement, but yes. I would be very fearful of that.

N.T. at 21-22.

Drumheller emphasized that public access to view the Department's transport procedures would create a real risk of detainees being better equipped to escape from the Department:

Q. Would the camera images also capture not only the areas of ingress to the [Department] but areas of being able to exit the [Department]?

A. . . . Our hallways are littered with doors and stuff like that, and if you understand which [ ] they are [sic], you'll get to them. But if you just ran loose, like you were trying to escape the building, the likelihood of you catching the right door to be able to get yourself out of the building would be minimal. However, if you had advance knowledge of that, you'd have access to move within the [Department] at your leisure.

Q. Does the video capture, for example, if a detainee is brought into a holding cell, where the keys are maintained?

A. Yes.

9

. . . .

Q. What risk could that cause?

A. Well, one of the things, the simple risk would be to escape, and one of the things, the easiest access, is my swipe card. Now, if this card was taken from me, in my case, they would have access to virtually the entire building. So it wouldn't take much to figure out, if you watched us coming in and out of the building all the time. And try to remember that you're capturing the whole – they're asking for the entire day's activity of our movement in the building. So you're going to see when officers come in. You're going to know when our shifts are. You're going to know who goes where within the building. You pretty much have the entire information in the entire building.

. . . .

Q. And in this day and age, we know certain things have happened out in the world, unfortunately, involving police officers. Is there concern about giving the general public a videotape of your police procedures?

A. Not only will you be giving them our procedures, but you'll give them a [3]-D print of our entire building.

Q. And would that cause a substantial risk of harm to not only the officers and detainees, but anybody else in the building?

A. Absolutely.

N.T. at 21-25.

Drumheller specifically described that the October 4, 2015 footage depicts a footprint of "probably 80 percent" of the non-public area of the Department:

A. . . . . So you would be able to see when our officers come into work. You can see when they go to the bathroom. You'd be able to see pretty much everything about them.

. . . .

Q. By providing that information to the general public --

10

. . . .

Q. -- would there be a substantial risk of harm to the security of the individuals in that building?

A. Absolutely.

Q. And what would that risk of harm be?

. . . .

A. Unfortunately, we live in a world of social media. It's very easy to put out there all the information, and if you turn a video over to somebody, they have the right to do with it what they want. And that's one of my fears, is that they'll be able to show everybody how we handle everything, how we transport people, and how they walk, prisoners walk in and out of the police station.

Q. And why would that be a risk?

A. It would be a risk to every officer then who's there, because they can understand the procedures and they can understand how to defeat them.

Q. Could it also be a risk to other detainees?

A. Absolutely.

Q. Is it your belief, [Drumheller], that if the entirety of the various camera views of [Requester] from October 5th, 2015 [sic], were provided to her, that it would constitute a substantial risk of harm to the general public as well as to the law enforcement personnel?

A. Yes.

N.T. at 26-32. Based upon Drumheller's testimony, the trial court concluded that "[h]arm to [the Department]'s officers, staff or detainees is reasonably likely to occur with the release of the [footage]. . . . The release of the [footage] is reasonably likely to jeopardize or threaten the personal safety and security of individuals within the [Department]." Trial Ct. FOF at 8.

11

This Court has recognized that the RTKL's security-related exceptions are of particular concern in police and prison settings.[13] *See Carey.* This Court has also upheld an OOR determination to exempt from disclosure a record that "would, if made public, assist criminals in their efforts to achieve a criminal objective[.]" *Adams v. Pa. State Police*, 51 A.3d 322, 325 (Pa. Cmwlth. 2012). Finally, this Court

---

[13] Notably, effective September 5, 2017, the General Assembly amended the Judicial Code by adding Chapter 67A ("Recordings by Law Enforcement Officers"). Section 67A02(a) of the Judicial Code states that the new provisions and "not the [RTKL], shall apply to any audio recording or video recording made by a law enforcement agency." 42 Pa.C.S. § 67A02(a). Section 67A02(b) of the Judicial Code provides: "**Nothing in this chapter nor the [RTKL] shall establish a right to production of an audio recording or video recording made inside a facility owned or operated by a law enforcement agency** or to any communications between or within law enforcement agencies concerning an audio or video recording." 42 Pa.C.S. § 67A02(b) (emphasis added). Under Section 67A06 of the Judicial Code, appeals from a law enforcement agency's denial are not taken to the OOR, but to the court of common pleas. 42 Pa.C.S. § 67A06. Section 67A06(e) of the Judicial Code specifies:

> A court of common pleas with jurisdiction may grant a petition under this section, in whole or in part, and order the disclosure of the audio recording or video recording only if the court determines that the petitioner has established all of the following by a preponderance of the evidence:
>
> (1) The request was not denied under [S]ection 67A04 [of the Judicial Code] (relating to law enforcement review) or the request was denied under section 67A04 and the court of common pleas with jurisdiction determines that the denial was arbitrary and capricious.
>
> (2) The public interest in disclosure of the audio recording or video recording or the interest of the petitioner outweighs the interests of the Commonwealth, the law enforcement agency or an individual's interest in nondisclosure. In making a determination under this paragraph, the court of common pleas may consider the public's interest in understanding how law enforcement officers interact with the public, the interests of crime victims, law enforcement and others with respect to safety and privacy and the resources available to review and disclose the audio recording or video recording.

42 Pa.C.S. § 67A06(e). Although Chapter 67A was not added to the Judicial Code until after the trial court issued its opinion herein and, thus, the new provisions do not govern this case, we nevertheless find the General Assembly's intention instructive.

12

has ruled that opinions regarding safety and security rendered by a law enforcement officer with over 20 years of experience are "not mere speculation or conjecture." *Id.*

Here, Drumheller's testimony consisted of much more than a general conclusion of speculative harm. Rather, his testimony specifically detailed the real and apparent dangers to the Department's officers and law enforcement staff, as well as the general public and other detainees, if certain portions of the footage are made public. However, because the record evidence does not reflect which portions of the footage implicate those personal security concerns, the Court remands this matter to the trial court to determine which parts of the footage are exempt under Section 708(b)(1)(ii) of the RTKL. Specifically, the trial court is directed to examine the footage to determine which cameras capture secure areas of the Department referenced by Drumheller as posing a security risk to the Department's officers, law enforcement, staff, the general public and other detainees.

### b. Public Safety

Section 708(b)(2) of the RTKL states that records are exempt if "maintained by an agency in connection with . . . law enforcement or other public safety activity that, if disclosed, would be reasonably likely to jeopardize or threaten public safety or preparedness or public protection activity . . . ." 65 P.S. § 67.708(b)(2). "To establish this exemption, an agency must show: (1) the record at issue relates to a law enforcement or public safety activity; and (2) disclosure of the record would be reasonably likely to threaten public safety or a public protection activity." *Smith ex rel. Smith Butz, LLC v. Pa. Dep't of Envtl. Prot.*, 161 A.3d 1049, 1062 (Pa. Cmwlth. 2017). As is required by the RTKL's personal security exemption, more than mere speculation is necessary for the Borough to meet its burden under the public safety exemption. *Carey*.

Here, Drumheller's detailed testimony specifically described the real and apparent dangers that release of the footage would certainly create if the layout of the non-public areas of the Department were disclosed, including the armory and other sensitive locations within the Department, public knowledge of which could place the safety of the Department's employees and the public at risk. However, because the record evidence does not reflect which portions of the footage capture the armory or other secure locations within the Department as referenced by Drumheller, the Court remands this matter to the trial court to determine which parts of the footage do so, and are thus exempt under Section 708(b)(2) of the RTKL.

### c. Safety or Physical Security of a Building

Section 708(b)(3) of the RTKL states, in pertinent part, that records are exempt if their disclosure "creates a reasonable likelihood of endangering the safety or the physical security of a building, . . . which may include . . . building plans or infrastructure records that expose or create vulnerability through disclosure of the location, configuration or security of critical systems[.]" 65 P.S. § 67.708(b)(3). "For this exemption to apply, 'the disclosure of' the records, rather than the records themselves, must create a reasonable likelihood of endangerment to the safety or physical security of certain structures or other entities, including infrastructures." *Smith*, 161 A.3d at 1062. As is required by the RTKL's personal security and public safety exemptions, more than mere speculation is necessary for the Borough to meet its burden under the safety or physical security of a building exemption. *Carey*.

The trial court found that "[v]iewing the requested [footage] chronologically[] provides a video blueprint of the restricted, non-public areas of the [Department]. . . . Release of the [footage] is reasonably likely to endanger the safety or the physical security of the [Department]." Trial Ct. FOF at 9. This Court agrees. However, because the record evidence does not reflect which specific portions of the

14

footage implicate building security concerns, the Court remands this matter to the trial court to determine which camera footage is exempt under Section 708(b)(3) of the RTKL.

### d. Criminal and Noncriminal Investigations

Section 708(b)(16) and (17) of the RTKL exempt from disclosure records which "relat[e] to or result[] in a criminal investigation" and which "relat[e] to a noncriminal investigation," respectively. 65 P.S. § 67.708(b)(16), (17). Further, "record[s are] not considered [] public record[s] under Section 102 of the RTKL if [they are] 'exempt under any other [s]tate or [f]ederal Law,' including [] CHRIA." *Barros v. Martin*, 92 A.3d 1243, 1250 (Pa. Cmwlth. 2014).

> CHRIA prevents the disclosure of 'investigative information' to the public. 18 Pa.C.S. § 9106(c)(4). CHRIA defines 'investigative information' as: 'Information assembled as a result of the performance of any inquiry, formal or informal, into a criminal incident or an allegation of criminal wrongdoing and may include modus operandi information.' 18 Pa.C.S. § 9102.

*Pa. State Police v. Grove*, 161 A.3d 877, 895 (Pa. 2017) (*Grove II*).

However, "records connected to a criminal proceeding are '**not automatically exempt**' as investigative records." *Kim*, 150 A.3d at 158 (emphasis added). The Court must first determine whether the footage at issue "constitute[s] 'investigative information' as defined by CHRIA." *Grove II*, 161 A.3d at 895. If it does not, then the footage must be examined to determine whether it is exempt.

In *Grove II*, our Supreme Court agreed with this Court that motor vehicle recordings (MVRs) are not automatically exempt **even when they relate to or result in a criminal investigation** because their primary purpose is to "document troopers' performance of their duties in responding to emergencies and [] their interactions with members of the public," rather than to "document, assemble or

15

report on evidence of a crime or possible crime." *Grove II*, 161 A.3d at 885 (quoting *Pa. State Police v. Grove*, 119 A.3d 1102, 1108 (Pa. Cmwlth. 2015) (*Grove I*), *aff'd*, *Grove II*); *Commonwealth v. Pa. State Police*, 146 A.3d 814, 818 (Pa. Cmwlth. 2016) (emphasis added). Where recordings depict "nothing more than what a bystander would observe[,]" they cannot be given protections under the RTKL or CHRIA. *Grove II*, 161 A.3d at 894.

Here, because the Borough presented no evidence that the purpose of the footage of the Department's public areas was created "merely or primarily to document, assemble or report on evidence of a crime or possible crime[,]" under *Grove II*, this Court cannot hold that the footage revealing the Department's public area is automatically protected under the RTKL or CHRIA. *Id.* at 885. The Department has the burden to "demonstrate [that] a record falls within [an] exemption." *Id.* at 894. The Department produced no evidence that the public area footage pertains to either a criminal or noncriminal investigation. Because the recordings of the public areas depict "nothing more than what a bystander would observe[,]" the RTKL and CHRIA criminal and noncriminal investigation exemptions do not apply to the footage showing the Department's public areas. *Id.* Accordingly, the trial court's order is reversed to the extent that it exempts from disclosure the footage of the Department's public areas.

As to the Department's non-public, restricted areas, the Borough's evidence established that the footage is recorded and monitored by the Department "24 hours a day, seven days a week" for security purposes. Trial Ct. FOF at 4. These records are, by virtue of their continuous creation, recorded "in many instances that plainly do not involve criminal activity[.]" *Grove II*, 161 A.3d at 895. Therefore, as discussed above, at a minimum, some of the footage is not protected information, and must be examined consistent with this Opinion to determine whether the criminal and noncriminal investigation exemptions apply.

16

The trial court in the instant matter did not conduct such an inquiry. Rather, the trial court summarily concluded that "[r]elease of the [footage] reveals the progress or result of [Requester]'s criminal investigation and raises issues of infringement of an individual's reasonable expectations of privacy." Trial Ct. FOF at 9-10. However, the record is clear that the Borough failed to prove that the footage at issue was more than merely connected to Requester's criminal investigation. Simply because the footage captured Requester's detainment and subsequent processing does not mean that the Department was, at that time, conducting an investigation into Requester's case or that any aspect of the footage was related to a criminal or noncriminal investigation.

Further, there is no evidence that the Department created the footage as part of Requester's noncriminal case against the Department. The trial court concluded that "[t]he [footage] is investigative material concerning a noncriminal investigation," since it relates to Requester's civil rights action against the Borough stemming from her arrest. *Id.* at 10. However, this Court has repeatedly held that "a requester's motivation [or reasons] for making a request [are] not relevant[.]" *Padgett v. Pa. State Police*, 73 A.3d 644, 647 (Pa. Cmwlth. 2013) ("An explanation of why a requester believes an agency should disclose records to him does not . . . explain why the requested records are public and available to everyone."); *see also Hunsicker v. Pa. State Police*, 93 A.3d 911 (Pa. Cmwlth. 2014).

Therefore, the trial court should have conducted an inquiry as to what footage from which cameras may be exempt under Section 708(b)(16) and (17) of the RTKL or Section 9106 of CHRIA, rather than making a blanket ruling that all of the Department's October 4, 2015 footage is beyond Requester's reach under the RTKL

and CHRIA.[14]  Accordingly, this matter is remanded for the trial court to determine which specific portions of the footage related to or resulted from the Department's criminal and noncriminal investigations.

### 3. Recusal

Lastly, Requester argues that the trial judge should have recused himself because he had a conflict of interest in denying the Request since he also issued the order leading to her arrest.  Requester Br. at 23.  Requester admits that she did not raise the recusal issue before the trial court.  However, she claims this Court should nonetheless consider her argument because the potential for "bias on the part of the judge[] [wa]s too high to be constitutionally tolerable[]." *Id.*

"Pursuant to [Pennsylvania Rule of Appellate Procedure (Rule)] 302(a), '[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal.' [Pa.R.A.P. 302(a)]." *Butler v. Dauphin Cty. Dist. Attorney's Office*, 163 A.3d 1139, 1143 (Pa. Cmwlth. 2017).  Requester never filed a recusal motion while her Request was pending before the trial court and she offers no reason for her failure to raise the recusal issue sooner.  The Pennsylvania Supreme Court has ruled that "a party seeking recusal or disqualification [is required] to raise the objection at the earliest possible moment, or that party will suffer the consequence of being time[-]barred." *In re Lokuta*, 11 A.3d 427, 437 (Pa. 2011) (quoting *Goodheart v. Casey*, 565 A.2d 757, 763 (Pa. 1989)).[15]  Accordingly, Requester's claim is waived.

---

[14] Such inquiry is particularly important considering that the Borough has gathered and provided the footage to the DA for evaluation and, thus, assembled criminal investigation information. *See California Borough*.

[15] Further, the *Butler* Court held that a judge need only recuse where due process concerns are implicated. *Id.*  Specifically, due process is implicated where a judge serves a dual role in the same criminal case. *Id.*  Here, while the trial judge did preside over the case that resulted in issuing the order that led to Requester's criminal arrest and RTKL Request, there is no due process issue because the Request is a civil action which is not transformed into a criminal case merely because

## Conclusion

For all of the above reasons, the trial court's order is affirmed in part, reversed in part, and vacated and remanded in part.

_____
ANNE E. COVEY, Judge

---

Requester sought records relating to her criminal arrest. Therefore, even if Requester had not waived the issue, remand for a hearing by another jurist would not be warranted.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Borough of Pottstown | : | |
| | : | |
| v. | : | |
| | : | |
| Shanicqua Suber-Aponte, | : | No. 478 C.D. 2017 |
| Appellant | : | |

## O R D E R

AND NOW, this 8th day of January, 2019, the portion of the Montgomery County Common Pleas Court's (trial court) November 21, 2016 Order denying Shanicqua Suber-Aponte's (Requester) recusal demand is AFFIRMED. The portion of the trial court's order denying Requester's Right-to-Know Law[16] request as insufficiently specific is REVERSED. The portions of the trial court's order exempting disclosure on personal security, public safety, building security and criminal and noncriminal investigation grounds are VACATED and REMANDED to the trial court for further review consistent with this Opinion.

Jurisdiction relinquished.

_____
ANNE E. COVEY, Judge

---

[16] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.