# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Eleanor Myers and Youth Sentencing    :
and Reentry Project,    :
                Petitioners    :
   :
           v.    :    No. 268 C.D. 2024
   :    ARGUED: November 7, 2024
Pennsylvania Department of Corrections : 
(Office of Open Records),    :
            Respondent    :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE LORI A. DUMAS, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## OPINION NOT REPORTED

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**             **FILED: February 24, 2025**

Petitioners, Eleanor Myers and the Youth Sentencing and Reentry Project (Project),[1] petition this Court for review of the Office of Open Records' Final Determination denying their appeal from the Pennsylvania Department of Corrections' denial of their Right-to-Know Law (RTKL)[2] request. At issue is whether the Department met its burden of establishing that the responsive policy is exempt from disclosure pursuant to the RTKL's public safety exception. Upon

---

[1] The Project describes itself as "a Philadelphia-based organization that works with those previously sentenced to life in prison without the possibility of parole for crimes committed as children." Pet'rs' Br. at 4. The Project asserts that many of these individuals have been resentenced and are now on lifetime parole following the decisions in *Miller v. Alabama*, 57 U.S. 460 (2012), and *Montgomery v. Louisiana*, 557 U.S. 190 (2016). *Id.*

[2] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

review, we reverse except as to allow redaction of the titles of decisionmakers responsible for approving supervision levels.

The relevant background of this case is as follows. In September 2023, Petitioners submitted their request to the Department stating:

> There is a written Department . . . policy that covers "Special [C]ircumstances Parole," which is akin to Administrative Parole but available in circumstances other than those covered by Administrative Parole. The policy on Special Circumstances Parole includes eligibility, process, and criteria for consideration for this status. We would like a complete copy of this policy.

Certified Record (C.R.) at 13.

After invoking a 30-day extension,[3] the Department denied the request, asserting that the responsive policy is exempt from disclosure for multiple reasons, including the public safety exception found at Section 708(b)(2) of the RTKL, 65 P.S. § 67.708(b)(2). That section provides:

> **(b) Exceptions**.--Except as provided in subsections (c) and (d), the following are exempt from access by a requester under this act:
>
> . . . .
>
> (2) A record maintained by an agency in connection with the military, homeland security, national defense, law enforcement or other public safety activity that, if disclosed, would be reasonably likely to jeopardize or threaten public safety or preparedness or public protection activity or a record that is designated classified by an appropriate Federal or State military authority.

*Id.*

---

[3] *See* Section 902 of the RTKL, 65 P.S. § 67.902.

2

Petitioners appealed to OOR challenging all the exceptions cited by the Department and identifying five specific questions they sought to have answered by gaining access to the requested policy. C.R. at 7-9. By letter dated November 9, 2023, the Department identified Policy 12.04.01.06 "on the topic/subject of Levels of Supervision" (the Policy)[4] as responsive to the request and outlined its reasons for invoking the public safety exception[5] along with supporting case law. C.R. at 32-35. The Department also submitted the declaration of Christian M. Stephens, Deputy Secretary for Field Services for the Pennsylvania Parole Board, detailing what the Policy covers and how its dissemination would "severely hamper [the Board]'s official law enforcement functions of supervising parolees and reintegrating them into the community, as well as endangering the public." C.R. at 41. Deputy Secretary Stephens declared, among other things:

> 33. The purpose of Policy 12.04.01.06 is to explain the various levels of probation/parole supervision of offenders that [the Board] oversees.
>
> 34. Pursuant to Policy 12.04.01.06, all offenders supervised by the [Board] are assigned a level of supervision based upon a risk and needs assessment, or as ordered by the [Board], or as otherwise required by statute.
>
> 35. Importantly, all offenders placed on supervision are assigned a level of supervision that will provide adequate protection to the community and will provide appropriate services to the offender to address their

---

[4] Petitioners point out that the Policy is identified by the Department in its November 9, 2023 letter as both Policy 12.04.01.06 and 12.**01**.01.06. *See* C.R. at 32.

[5] The parties before us, as well as our case law, refer to the relevant exception by various names, e.g., the public safety exception, the law enforcement exception, and the law enforcement/public safety exception. For clarity, we will refer to it simply as the public safety exception.

individual risks/needs and to assist in their pro-social assimilation into the community.

36. If Policy 12.04.01.06 were publicly available under the RTKL, offenders would be provided with a detailed roadmap of the various levels of supervision, the necessary criteria for an offender to be placed into a particular level of supervision, and the supervision requirements associated with each level of supervision.

37. If the public were given access to the contents of Policy 12.04.01.06, offenders would with certainty manipulate that information in various ways, all of which would hamper [the Board]'s official law enforcement function of supervising parolees and protecting the public until such time as they are fully integrated into the community.

38. With access to Policy 12.04.01.06, offenders would manipulate their risk assessments in order to be placed onto a lower level of supervision than they should be placed on, thereby avoiding appropriate accountability and hampering [the Board]'s proper role in their supervision and its protection of the community.

39. Similarly, with access to Policy 12.04.01.06, offenders would manipulate their supervision in order to be prematurely released from supervision, thereby avoiding accountability and hampering [the Board]'s proper role in their supervision and its protection of the community.

40. With access to Policy 12.04.01.06, offenders would manipulate its contents in order to avoid certain needs assessments, thereby failing to receive necessary resources that would aid in their successful reintegration into the community.

41. With access to Policy 12.04.01.06, offenders would manipulate its contents in order to anticipate visits or searches from their assigned Parole Agents, thereby placing those agents in danger as well as hampering [the

4

Board]'s proper role in their supervision and its protection of the community.

42. Similarly, if offenders were able to anticipate visits or searches from their assigned Parole Agents, they could better hide further criminal or nefarious activities and avoid proper accountability for the same, thereby hampering [the Board]'s proper role in their supervision and its protection of the community.

43. With access to Policy 12.04.01.06, offenders would manipulate its contents to better understand the discretionary role that Parole Agents play in their supervision, including strategies and interventions, which they would use to blackmail and/or exact retribution against those agents, thereby hampering [the Board]'s proper role in their supervision and its protection of the community.

C.R. at 39-41.

OOR issued its Final Determination on January 9, 2024, denying Petitioners' appeal. OOR found that the Department met its burden of proving that disclosure of the Policy "would be reasonably likely to threaten public safety or a public protection activity," and therefore, the Policy falls under the RTKL's public safety exception. C.R. at 62-63. Petitioners then appealed to this Court. By order issued October 23, 2024, we directed the Department to submit an unredacted copy of the Policy to the Court for *in camera* review, which it did on October 28, 2024. During oral argument, Counsel for the Department was asked if his client wished to supply the Court with a version of the Policy with portions specifically implicating the public safety exception redacted. The Department declined to do so.

5

The issues Petitioners[6] raise on appeal can be paraphrased as follows: (1) whether the Department met its burden with respect to the RTKL's public safety exception; and (2) even if the public safety exception applies, whether portions of the Policy that implicate public safety should be redacted, rather than the entire Policy being withheld.[7]

We begin by noting that records in the possession of an agency are presumed public under the RTKL "unless they are: (1) exempt under Section 708 . . . ; (2) protected by privilege; or (3) exempt under any other [f]ederal or [s]tate law or regulation or judicial order or decree." *Borough of Pottstown v. Suber-Aponte*, 202 A.3d 173, 180 (Pa. Cmwlth. 2019) (quotation omitted). *See also* Section 305(a) of the RTKL, 65 P.S. § 67.305(a). Exemptions must be narrowly construed given the RTKL's remedial nature and its goal of promoting government transparency and access to information. *Suber-Aponte*, 202 A.3d at 179-80; *California Borough v. Rothey*, 185 A.3d 456, 465 (Pa. Cmwlth. 2018). As the Commonwealth agency receiving the request, the Department bears the burden of proving, by a preponderance of the evidence,[8] that the Policy is exempt from disclosure. *See*

[6] The Abolitionist Law Center and Amistad Law Project filed an *amici curiae* brief advocating that transparency into the supervision structures of parole can improve public safety and promote accountability. They further maintain that the Department failed to meet its burden because the proffered threats to public safety from disclosing the Policy are not only speculative but belied by data regarding those who might qualify for special circumstances parole.

[7] Petitioners also claim that there is a dispute as to what Department policy is responsive to their request given the fact that the Department's November 9, 2023 letter references Policy 12.04.01.06 and 12.**01**.01.06. C.R. at 32. However, this misidentification only occurs once, and the Department clarified both in its brief to this Court and during oral argument that the correct Policy is 12.04.01.06. Because the so-called misidentification is merely a typographical error, Petitioners' argument lacks merit.

[8] Preponderance of the evidence is "the lowest evidentiary standard, . . . tantamount to a more likely than not inquiry." *Carey v. Pa. Dep't of Corr.*, 61 A.3d 367, 374 (Pa. Cmwlth. 2013) (*Carey*) (quotation omitted).

*Rothey*, 185 A.3d at 464-65; *Carey v. Pa. Dep't of Corr.*, 61 A.3d 367, 372 (Pa. Cmwlth. 2013).

With respect to the public safety exception, "an agency must show: (1) the record at issue relates to a law enforcement or public safety activity; and (2) disclosure of the record would be reasonably likely to threaten public safety or a public protection activity." *Suber-Aponte*, 202 A.3d at 184 (quotation omitted). "In interpreting the 'reasonably likely' part of the test, as with all the [RTKL's] security-related exceptions, we look to the likelihood that disclosure would cause the alleged harm, requiring more than speculation." *Carey*, 61 A.3d at 375. Our Supreme Court has further expounded on this exception as follows:

> There can be no question that law enforcement agencies require the ability to protect documents that would reveal methods, protocols, identities, and other information the secrecy of which is essential to the agencies' ability to ensure public safety. Thus, even while construing the public safety exception strictly, courts should proceed with care not to narrow its application so much that public safety is compromised.

*Am. C. L. Union of Pa. v. Pa. State Police*, 232 A.3d 654, 666 (Pa. 2020) (*ACLU*).

Petitioners first assert that the Policy does not implicate a public safety activity, the first prong of the public safety exception, because it merely "informs those on long-term parole of the expectations and standards to which they will be held accountable." Pet'rs' Br. at 9. We reject this argument as the Stephens declaration outlines the functions and duties of the Board and how those duties relate to protecting public safety. The Court's *in camera* review of the Policy confirms that it specifically addresses "the various levels of probation/parole supervision of

7

offenders that [the Board] oversees," which is clearly a law enforcement activity as well as implicates public safety. C.R. at 39.

As to the second prong of the public safety exception, the reasonable likelihood component, the parties dispute the sufficiency of the Stephens declaration. We have repeatedly held that an agency can satisfy its burden in this context "through relevant and credible testimonial affidavits." *Allegheny Cnty. Dist. Att'y's Off. v. Wereschagin*, 257 A.3d 1280, 1294 (Pa. Cmwlth. 2021) [citing *Heavens v. Pa. Dep't of Env't Prot.*, 65 A.3d 1069, 1073 (Pa. Cmwlth. 2013)]. However, the Court has found "conclusory and speculative statements in an affidavit" to be insufficient. *Wereschagin*, 257 A.3d at 1294 (citing *Carey*, 61 A.3d at 376). In determining the adequacy of an affidavit,

> we consider whether [it] "(1) includes detailed information describing the nature of the records sought; (2) connects the nature of the various records to the reasonable likelihood that disclosing them would threaten public safety in the manner described; such that[] (3) disclosure would impair [the agency]'s ability to perform its public safety functions[], the alleged threatening consequence."

*Wereschagin*, 257 A.3d at 1294 (quoting *Carey*, 61 A.3d at 376).[9]

Petitioners argue that the Stephens declaration, which is the only evidence the Department submitted in support of its position, does not meet the *Carey* requirements because it is "factually bare and speculative[.]" Pet'rs' Br. at 3. They note that an affidavit in the RTKL context "must be detailed, nonconclusory, and submitted in good faith." *Brown v. Pa. Dep't of State*, 123 A.3d 801, 804 (Pa. Cmwlth. 2015). Agencies must prove that release of the record gives rise to a risk

---

[9] These considerations have been referred to as the *Carey* requirements or "*Carey*'s three boxes." *Wereschagin*, 257 A.3d at 1294 (quoting *ACLU*, 232 A.3d at 666).

8

that is "substantial and demonstrable," which has been described as "actual or real and apparent." *Suber-Aponte*, 202 A.3d at 180. According to Petitioners, the Stephens declaration "does nothing more than state that, based on [Deputy Secretary Stephens'] professional experience, the disclosure of the information would create a substantial risk of [] harm," which is insufficient. *Carey*, 61 A.3d at 376. The declaration "provides only sweeping conclusions unsupported by facts" and fails to specifically connect the information contained in the Policy to real and apparent threats to public safety. Pet'rs' Br. at 14.

Following our *in camera* review, we agree *generally* with Petitioners that the Department has not met its burden. The dire safety warnings asserted in the Stephens declaration are in large part speculative and not borne out by the substance of the Policy. *See, e.g.*, *Rothey*, 185 A.3d at 468 (agency failed to satisfy its burden for safety-related exceptions under the RTKL because it offered nothing more than speculation and conjecture). Rather than providing a "detailed roadmap" that parolees could use to manipulate the parole system, as the declaration asserts, the Policy merely provides administrative guidance regarding the various levels of parole supervision. We fail to see how parolees could use the broad, general information in the Policy to subvert or avoid certain needs assessments, which are not detailed in the Policy, nor how such general information could allow them to ensure they are placed in a lower level of supervision than that which is necessary to protect the public. The Policy similarly does not provide specifics as to when, where, and how parole agents should supervise parolees and conduct visits. At most, the Policy outlines the minimum number of face-to-face and collateral contacts which must occur per month based upon the parolee's supervision level. Given the general nature of the Policy, we do not see how its release could possibly allow

9

individuals to anticipate the timing and location of visits so as to place parole agents in danger. In sum, we agree with Petitioners that the declaration is speculative and conclusory and fails to demonstrate, for the most part, how disclosing the Policy "would threaten public safety in the manner described." *Wereschagin*, 257 A.3d at 1294 (quoting *Carey*, 61 A.3d at 376).

Further, we find this case distinguishable from the Court's determination in *Woods v. Office of Open Records*, 998 A.2d 665 (Pa. Cmwlth. 2010). There an individual submitted an RTKL request to the Board seeking its "Manual Chapter 4-Sex Offender Supervision Protocol[.]" *Id.* at 666. The Board granted in part and denied in part the request, providing the requester with a copy of the policy but with the "Supervision Strategies" section redacted.[10] On appeal to OOR, the Board asserted the public safety exception and supplied the affidavit of its deputy executive director explaining the purpose of the policy and setting forth multiple reasons for denying the request. *Id.* at 667. Notably, the affidavit explained that the Board promulgated the policy to explain to its staff the "*specialized aspects* concerning the supervision of sex offenders.*" *Id.* (emphasis added). If a sex offender knew how he or she was specifically monitored and assessed, those tools "could be manipulated" and used to "exploit the limitations of the parole agent's review." *Id.* at 668. The affidavit further explained that disclosure "would reveal the capabilities and the scope of the Board's sex offender management procedures and policies." *Id.* This information "would certainly be used by sex offenders to circumvent existing parole supervision procedures and practices, and therefore,

---

[10] The Board also denied the request as to the section of the policy titled "Polygraph." *Woods*, 998 A.2d at 666. On appeal, however, the requester conceded his argument regarding this section. *Id.*

would necessarily threaten public safety[.]" *Id.* OOR denied the requester's appeal based on this affidavit. In affirming OOR's determination, this Court reasoned

> it appears from the evidence submitted that the "Supervision Strategies" section [of the manual] is just what the title implies, a strategic guide for Board employees to employ when monitoring and supervising sex offender parolees. Provision of such to those who are the subject of supervision *or* to any member of the public would impair the effectiveness of that supervision, and thus threaten public safety.

*Woods*, 998 A.2d at 670 (emphasis in original).

Here, by contrast, the Policy presents only general guidelines for the various levels of parole, not "specialized aspects concerning the supervision" of a particular type of offender. *Woods*, 998 A.2d at 667. Therefore, disclosure of the Policy here does not present the same risk to public safety or the potential to impair the effectiveness of parole supervision as that found in *Woods*.

There is, however, one noted exception. At several points, the Policy identifies the title of the Department employee responsible for making decisions with respect to parolees' supervision levels, i.e., who must approve a parolee's assignment to another level of supervision. We agree with the Department's assertion in the Stephens declaration that access to such information could be used to intimidate or exact retribution against the decisionmakers, thus hindering their ability to conduct their public protection activities and impacting public safety.[11] *Cf. ACLU*, 232 A.3d at 666 (recognizing that law enforcement agencies must be able to protect documents that would reveal, *inter alia*, identities so as to ensure public

---

[11] Because the Department did not deny the request based on the personal security exemption found at Section 708(b)(1)(ii) of the RTKL, 65 P.S. § 67.708(b)(1)(ii), the Court cannot and did not analyze the denial under that provision.

11

safety); *Ocasio v. Pa. Dep't of Corr.* (Pa. Cmwlth., No. 306 C.D. 2017, filed Jan. 3, 2018), slip op. at 6-7 (finding the Department met its burden of establishing that inmate's requested records were exempt under personal security and public safety exception for various reasons, including potential risk of retaliation).[12] Therefore, contemporaneously with this opinion, the Court is providing the Department with a copy of the Policy indicating the information that can be redacted.

Accordingly, the Final Determination of OOR is reversed, except as noted above.

_____
**BONNIE BRIGANCE LEADBETTER**
President Judge Emerita

---

[12] Pursuant to Section 414(a) of the Court's Internal Operating Procedures, an unpublished memorandum opinion, although not binding precedent, may be cited for its persuasive value. 210 Pa. Code § 69.414(a).

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Eleanor Myers and Youth Sentencing : and Reentry Project, : Petitioners :
:
v. : No. 268 C.D. 2024
:
Pennsylvania Department of Corrections : (Office of Open Records), :
Respondent :

# **O R D E R**

AND NOW, this 24th day of February, 2025, the final determination of the Office of Open Records in the above-captioned matter is hereby REVERSED, except for the allowance of the redactions noted in the foregoing opinion. The Prothonotary shall promptly deliver a redacted version of the policy, under seal, to Respondent's Counsel. Within 30 days of this Order, Respondent shall provide Petitioners with a copy of the requested Policy with the redactions indicated in our contemporaneous communication.

_____

**BONNIE BRIGANCE LEADBETTER**
President Judge Emerita